Sama v. U.S. Attorney General Mr. Ritchie. Good morning, Your Honors. May it please the Court, Ronald D. Ritchie on I would like to state just at the outset that I think the government is misguided for three quarters of its brief, if not the whole brief, but three quarters of its brief is arguing about credibility issues. That issue is not before the Court. That was never raised by the government. It was never raised by the petitioner. The immigration judge, after looking at the totality of the circumstances, all the evidence, determined that the petitioner was credible. The Board confirmed that. So that issue isn't even before the Court. The issue before the Court is, does the substantial evidence, looking at the record as a whole, support the Board's decision? Well, as I understand it, your argument has to be that the record compels a different finding. Correct, Your Honor. That the record compels a finding of a reasonable fear of persecution. Is that right? Yes, Your Honor. That's totally correct. Okay. And that's a tough standard. It is. We have to view the evidence in the light most favorable to the government, right? Yes, Your Honor. So how is it that the government compels that finding? Well, if we just go by the immigration judge's decision, which the Board basically confirmed it was, I would note, a one-member judge or panelist, if you will, on the Board. Finders or single judges? Yes. But the immigration judge found that certain facts were credible. Basically, the petitioner's claim was credible, that he had suffered immense persecution. You know, specifically that it all started when two of his friends, one of them, his closest friend, who happened to be homosexual, were dismissed. He posted a message in support of his friends in the LGBTI community at the university. And thereafter, an arrest warrant is issued by the police because of his activities in support of the gay community and in support of his friends. He's beaten up by four men a few days after that. He's left on the ground bleeding. He's been slashed on the neck. Other students passing by find him there on the ground struggling. They take him to the hospital. To me, I don't see how that cannot be past persecution. Well, that assault only can result in a finding of persecution if it's something that, right, that the government's not going to do something about. I mean, that kind of criminal activity, right? If the government would protect him, does that matter? Well, it does matter, Your Honor, if the government could. The government couldn't. The government came to him when he was in the hospital. The police did, right? Yes. Interviewed him. And there's nothing to suggest that is there in this record that they didn't take that seriously. Yes, yes. Well, we don't know. But they came. They took a report. And he told them what had happened, right? Right. I'm sure they could see. With the expectation that they would do something about it, right? Right. And just on that point, Your Honor, there is no evidence in the record showing that the police did do anything after that. Well, yeah, there is. They came to his house to arrest him, didn't they? Exactly, Your Honor. So how does that show that the government's going to protect him if they're coming to arrest him? Well, you say they didn't do anything. They did do something following that. Right. They did something in the negative, I guess I would explain it that way. Yeah, they didn't do anything to protect him. They came to arrest him. And like so many other people in his situation, similarly situated, that were involved in the gay rights movement or were gay themselves, those individuals would get arrested. They would suffer in detention for lengthy times. Other inmates would rape them, would assault them. And the police and the detention officers would allow that. The record is replete with evidence that you have a homophobic element throughout the society in Cameroon. Not just society, but also with public officials, with the law. The law in Cameroon still today criminalizes same-sex activity. So the law hasn't changed. The police still have the right under that law to go arrest individuals such as the petitioner who are involved as advocates, who are associated with this community. Clarify for me just a little bit on the record. So the record indicates that he has this assault. He doesn't really file a complaint, but the police nonetheless come to seek out information for him. And I gather, obviously, he gets out of the hospital someday, and the police still don't arrest him, correct? Is that right? Correct. And so how many days after he got out of the hospital before he got himself over to the United States? So, Your Honor, he was attacked on November the 10th, taken to the hospital. Apparently that same day is when the police were called by the hospital and they came, talked to him, apparently completed a police report. He stayed in the hospital until November 25th. So he stayed there approximately 15 days. Okay. Okay? Receiving medical treatment for all the injuries he had suffered. Right. He's released. He goes to his cousin's estate, not his mother's, where he had stayed earlier. Although, actually, when he was attacked, he was living, I guess, in an apartment close to the campus. So he goes to his cousins. And then how much time passes before he comes to the United States? He left on December the 6th. So a very short time. So there was no attacks against him after that that the police did not protect him against? Well, there was. So after he left the hospital, he went to his cousins. He's there. Short time. And I'm not sure exactly of the date. December. Sorry. December 6th. Sorry. I was wrong about the date he left. I believe it was December the 8th. It's somewhere around there. December the 6th. So just a few days after he had left the hospital, he stayed in his cousins. During the night, a brick was thrown through the window. Okay? In the room where he stayed. There's a note attached to it. Threatening him because of his support of the LGBTI community and his activities. And he decides best to get out of Cameroon. He decides enough is enough. Okay. And he had, I read in the rec, he had applied four or five times for visas to get out before any of these incidents. And they had been denied based on false information he provided. Is that correct? Well, at least one of them was because of that reason. So even before all his protests about, even before his support of the gay movement, he was trying to get out of Cameroon. Is that correct? Yes. He had wanted to come here for a conference and other things, yes. But then he had these change of circumstances where he gets involved because he sees what's happening to his friends, his best friend, and one of his best friends was murdered. Another one disappeared. Here's the problem I'm having with your case. It appears to me that this is one of those cases where if the immigration judge had wanted to find a reasonable fear of persecution, it could have. But the standard is whether the record compels that finding. And as I understand it, he didn't really suffer any persecution at the hands of the government. He did suffer some persecution from private individuals that the government then went and interviewed him about. And then the question becomes, well, does he have a reasonable fear of future persecution if returned, that he'll be singled out? And we have the State Department country reports that say things have changed a lot in Cameroon and that mistreatment by the police has dropped dramatically. There's a reported incident in the 2015 report of a police officer rescuing a transvestite individual. I'm concerned that on that record, it's hard for you to say that or for you to establish that the record compels a finding of a reasonable fear of future persecution. My limited time here initially, Your Honor. Take as much time as you need to answer that question. Yes. As long as you stick to that question. Yes, I understand. That's a paramount question, Your Honor. It is. Well, first of all, with all due respect, Your Honor, I would differ somewhat in what the country reports a state and the Amnesty International report state. So, there are three State Department country reports, 2013, 2014, 2015. All right. I'm mainly concerned about 2014 and 2015. Okay. They talk about that it's diminished the arrest. The vote dropped dramatically. Okay. Thank you, Your Honor. You had that before me. You had that before you. But still, it still continues. The Supreme Court has said in Cardoso Fonseca, okay, that if there's even a 10% chance that a person would be. . . Yes. See, that's your burden in front of the immigration judge. This is. . . You just have to convince the immigration judge that there's a reasonable possibility, right? Right. You lost. Now, the burden is different. We don't evaluate that. Right. We have to evaluate whether the record supports the finding, could support that finding against you, or whether the record compels a contrary finding. Reasonable possibility is a 10% is out of the case. You lost on that. It seems to me. Am I wrong about that as a matter of law? Well, I think the standard of review, as the court notes, is correct. But I think on this record, even if things have significantly dropped, okay, that there's not as many arrests today as there were yesterday. And, Your Honor, actually, I think and I know these are facts outside the record, but. . . I don't want to hear them. Well, let me ask along that line. But your client's even more attenuated than a gay person would be. So if assaults and persecution of gays have dropped in Cameroon now, your client's not gay. So what is the evidence that suggests that a person who's not gay, who on one occasion years before had said something supportive of gays, that when he goes back to Cameroon, people are going to persecute him because of something he said in the past when he himself is not even gay? I think your client's a little more attenuated, is he not? No, Your Honor. As the immigration judge found that he's not because he's associated with individuals who are involved, who are gay, and he's supporting them in his activities. So in other words, he's determined to go back and support them again, get in, have some trouble with the government again so they don't have to leave the country. Yes, because it's ingrained in him about human rights and the human rights of gay individuals. If I can save— Mr. Ritchie, you've gone over a fair amount, but you've saved five minutes for rebuttal. We're going to give you the whole five minutes. Let's hear from Ms. Miles. Thank you. Good morning, Your Honors. I'm Erica Miles for the Attorney General. As Judge Pryor has pointed out, the standard is high here. The burden is high. Mr. Sama, to prove that this court must be compelled to conclude in his favor, agree with him. So that means even if there is evidence or even substantial evidence that could support his position here, that is not enough. He has to show that— Even if there's a lot of evidence. Right. He has to show that it compels reversal of what the agency found here. And the agency found that he failed to meet his burden of showing that the government of Cameroon was unable and unwilling to protect him in the past, that the government of Cameroon has any likelihood to go after him in the future or to protect him from those private actors. He just hasn't shown that whatsoever. So just to quickly address, there's no past persecution in this case because the acts were done by private actors. And we know that the police did in fact come, take his statement. He doesn't claim he didn't give them the full picture as to what and why it happened. He doesn't claim that the police would not investigate, that they said disparaging remarks. So he did tell the police when they came to the hospital that it was because he was a gay activist? He said he gave his claim as to what happened. And that's all we have in the record. But what's missing is important here. He doesn't say, I was afraid to tell them why it happened or that people thought that I was gay or that I'm helping. He said he gave them his statement as to what happened. And remember, additionally, a warrant was already out for his arrest at this point. So the police come to talk to him on the 10th. Meanwhile, a warrant had issued on the 5th, so five days. And he's in the hospital for two weeks. The police had plenty of opportunity to come, make sure he's well enough, come and arrest him in that two-week period. They never did. But they did execute the warrant or attempt to at his mother's house as soon as he got out, right? They did attempt. The timeline's a bit murky in this case because things had kind of changed. But the immigration judge credited his statement, which begins on page 283 in the record. And in his statement, he says the warrant issued on the 5th. And it was soon thereafter that the police went to execute the warrant at the mother's house. That would imply that it was before the November 10th attack, before the hospitalization. So we have— And what you're saying is it's just there's nothing clear in the record to say— There's nothing clear about when— —that the attempt to execute the warrant occurred after the attack. There's nothing clear to say it was after. And according to the statement, which is what the immigration judge credited, it strongly implies that it happened before the incident of the attack. But in any event, he was in the hospital for a two-week period after this November 5th warrant issued. The police never came for him. He got out of the hospital, was around in the area until about December 10th. He never, ever encountered the police again. He never suffered any other attack again either. There was an alleged brick-throwing incident that he didn't testify about, but it was in that statement that was credited by the immigration judge. But he didn't report it to the police. And he does have an obligation to do that because up until this point, we have no evidence showing that it would be futile or useless to report to the police. Well, there was a warrant out for his arrest. That doesn't— But the police hadn't arrested him up until that point. They didn't question him about their arrest or about his status. He suffered no repercussions for telling them in his statement that he was attacked due to the perception that he's gay or was a gay rights advocate. So there was no indication here. In addition—so that's the past. And in the forward-looking claim, again, we have everything that we know the police has already done as to taking his statement, not indicating they wouldn't investigate. And then we have the State Department 2015 report. So the immigration judge relied both on his own experiences with the police and with the private actors in addition to the country conditions, which when you compare to the 2013 report in the record and 2015, a dramatic difference, a dramatic drop in arrests of people who are, in fact, homosexual. Would you address the same question that—Judge Karn's question to opposing counsel about the difference between his role as an activist as opposed to a homosexual? Certainly. And with regard to the reports. Yes. With regard—OK. First and foremost, what is illegal in Cameroon is consensual homosexual activity. So it's more the act of being gay and acting upon that. There's nothing that I've seen in this record that outlaws activism, political support groups, people advocating or posting posters like he did advocating for gay rights. So his act of posting something in support of gay rights is not even unlawful or illegal. But the fact that he's perceived as being gay is something that would push him over into perhaps the category as someone who's perceived as gay. But regardless, the reports indicate that there were drastically diminished arrests of actual LBGTI individuals. In addition, there were— There's still extortion, though. There's still some extortion and harassment, but that does not amount to persecution, per se. And additionally, what I think is important in the report is that people who identify as LGBTI or even the activist groups that have come forward to the police sought their protection, reported threats, reported extortion. There are few to no reports that they were then arrested or extorted by the police. So they didn't suffer repercussions from self-reporting, essentially, to the police and seeking the police help, and the police did come forward, take their claim, and investigate. So the reports between 2013 and 2015 are drastically different. And again, people are less afraid to come forward, according to the reports, because they're not then being arrested for identifying as one of those groups or activists in support of their rights. So I think the country reports, coupled with his own experiences with the police, really are substantial evidence, which is all this Court needs to let this decision by the agency stand. If the Court doesn't have any further questions for me, I'll sit down. Thank you. Thank you, Ms. Miles. Mr. Ritchie, would you say five minutes for rebuttal? Thank you. I'll try to keep it less. Okay. So I think just a couple of points that the government has raised, one about whether extortion equates to persecution. I think that's a hard road to go down, to argue that extortion would not be persecution. And secondly, she argues that the petitioner's own experience, in addition to the country reports, support the Board's finding. I think it's totally the opposite. There's nothing in the petitioner's claim to show that he either hasn't been persecuted or has a well-founded fear of persecution in the future. So as I understood what she was arguing, she was saying that after he was assaulted and was in the hospital, the police came and took his statement. He reported the incident. There was no attempt while there to execute this warrant. As I understood it, what she was saying was the immigration judge is considering that experience along with the country reports about the dramatic improvement in evaluating whether he has a reasonable fear of future persecution. That is a fear that he will be singled out for persecution if returned to Cameroon. I think that I agree, Your Honor. I believe that is the government's argument. But I think that the immigration judge misinterpreted that scenario, those facts, that the police came to the hospital. Why? Because the hospital called them, said, there's a victim here. Someone's a victim of a crime. Come. So the police show up. They show up the same day it happened. They, in all likelihood, didn't have a chance to go look up in the computers, assuming they even have computers there at the police station, to look up, oh, is this person, is this victim wanted by the police? They do their job. They show up. They do a report. They leave. They don't do anything after that. The record is, there's no evidence in the record to show they did anything after that. Part of this, as I understood her argument, that you don't appear to be really responding to, which is, and when the police show up, your client tells them what happened, right? Doesn't say, I don't want to talk to them. They've got a warrant out for my arrest. I don't want to talk with them. I'm a gay rights activist. I'm, you know, if I do that, then they're going to target me. He doesn't, there's nothing in the record to suggest when they come to get his statement and to meet with him that he fears them. Right. There is nothing there. We don't know. Right. And so the district court could consider that evidence along with the country reports and find that he doesn't have a reasonable fear of future persecution, of being singled out if returned to Cameroon. That's what I understood her argument to be. I just want to make sure you're responding to that argument. Well, Your Honor, I don't believe that's a reasonable inference that the immigration judge made, okay, that the police were there or that the police actually were doing, taking steps to protect the petitioner from these anti-gay groups or to control the anti-gay groups. I don't think that example of the police showing up and taking a police report at the hospital, and we don't know how much they questioned him because we have to keep in mind his state, his condition. He's just been traumatically attacked. Mr. Ritchie, you know, you're concentrating a lot on what's in the police's mind. And, you know, the thing about that incident, the visit at the hospital, is what it speaks to in terms of a reasonable inference for the fact finder about his state of mind and his reasonable fear. And, Your Honor, on that point, the judge found that he did have a subjective fear of persecution. And, Your Honor, the State Department reports, yes, they mentioned an example of where a police officer walking by, seeing a transvestite being attacked, got involved. One instant. While the State Department report is clear that there's been many activities or many actions of conduct against individuals similarly situated to the petitioner. And so I think we have to look at the totality. We can't just look at single items of evidence that the immigration judge and the board relied upon instead of looking at the whole record. Thank you. It may be my fault, but you weren't able to stay under the five minutes. But that's okay. Thank you. We have your case. We understand it. And we will be in recess until tomorrow. Thank you. Thank you, Your Honor. All rise. Thank you, Your Honor. Can I throw this in the trash? Oh, sure. Thank you. I appreciate it. All right. Okay. Have a good day. Thank you. Thank you. Beautiful courtroom. Huh? Beautiful courtroom. It is. Yeah, 1906. Huh? I don't think anybody does this anymore, do they? No. How long have you only been here? Huh? How long have you been here? 13 years. Oh, wow. Not very long, considering. Really? I wish it'd be longer. All right. That's all right. Have a good day. Thank you. Thank you. Thank you.  Thank you. Go down there before they give up. Thank you.